UNITED STATES *v.* ROHNER GEHRIG & CO., INC.

No. 5724.—Invoice dated Baden, Switzerland, September 19, 1939.
Certified September 20, 1939.
Entered at New York, N. Y., October 11, 1939.
Entry No. 737571.

Third Division, Appellate Term

(Decided September 30, 1942)

*Paul P. Rao,* Assistant Attorney General (*Dorothy C. Bennett,* special attorney), for the appellant.
*Brooks & Brooks* (*Frederick W. Brooks* of counsel) for the appellee.

Before CLINE, KEEFE, and EKWALL, Judges

CLINE, Judge: This is an application for a review of the decision of the trial court in *Rohner Gehrig & Co., Inc.* v. *United States,* Reap. Dec. 5467. The merchandise the subject of the appeal to reappraisement consists of one exhaust supercharging blower, type VTx, with accessories, exported from Brown, Boveri & Co., Ltd., of Baden, Switzerland, in September 1939. The article was invoiced at $2,192 which included packing to the value of $20 and upon entry the importer added $960 under the authority of section 503 (b) of the Tariff Act of 1930 to meet advances made by the appraiser in a test case under reappraisement covered by entry No. 730556 of September 4, 1936. The sole question involved is whether the sum $960 added by the importer on entry is a part of the export value of the supercharger. It is admitted that there was no higher foreign value for the merchandise.

The importer claimed in the court below that the added $960 (which is not mentioned on the invoice) represents a fee for Dr. Alfred J. Buchi of Winterthur, Switzerland, for services and a license to use his patented system for the construction of a Diesel engine manufactured by the Worthington Pump & Machinery Corporation in the United States, by the use of which services and system a greater output or horsepower is obtained from the engine and that the charge or fee has nothing to do with the value of the supercharger which was imported for use in the construction of the engine. The trial court held that the fee for Dr. Buchi was not a part of the dutiable value of the imported supercharging blower.

Rohner Gehrig & Co. are customs brokers who made the entry for the plaintiff.

The plaintiff in the court below introduced, as exhibit 1, an affidavit of Mr. Adolph Meyer who is managing director of Brown, Boveri & Co., Ltd., the manufacturer of the supercharger. The affiant states that the price $2,172 for such blower, without packing, is the price at the time of shipment which his firm freely offered the same blower to all purchasers for exportation to the United States, in the usual wholesale quantity and in the ordinary course of trade and that this particular type of blower is not usually sold for use in the home market; that Mr. Alfred J. Buchi has had no part in the perfection of the design of this blower. The following explanation of the $960 fee is made in the exhibit:

These blowers are freely offered in the open market to any builder of Diesel engines or other person interested in obtaining them, and such offers or sales do not carry with them any obligation to engage the services of the said Mr. Alfred J. Buchi although our company believes in the advantages to be gained by the use of Mr. Buchi's services, and often recommends him to our customers, but as I am informed by Mr. Buchi that he maintains a consulting engineering office in Winterthur, Switzerland, and has no branch office or agents in other countries, my company having branch offices or at least agents in the United States and other countries has undertaken the collection of fees charged by Mr. Buchi to some of our customers who have engaged his services, and upon payment of this fee to my firm it is immediately transferred to Mr. Buchi, and my company and its branches or agents in this respect act only as a collection agency for this fee for the sake of convenience and as a special accommodation to Mr. Buchi.

In the case of the above shipment to the Worthington Pump and Machinery Corporation, Mr. Buchi made an arrangement with the said Worthington Pump and Machinery Corporation, as I am informed, to render certain engineering services to the said corporation for the sum of $960, which has been collected by our organization and paid over to Mr. Buchi.

The said services rendered by Mr. Buchi to the Worthington Pump and Machinery Corp. consisted of advice as to certain changes and adjustments in the Diesel engines manufactured by the Worthington Pump and Machinery Corp. which will further improve the results of supercharging said engines without any changes in the supercharging blower itself, which blower has been entirely conceived and developed by the engineers and other employees of Brown, Boveri & Co. Ltd.

Brown, Boveri & Co. Ltd. has sold in the years 1935, 1936, 1937, and 1938 our supercharging blowers to various customers in Italy, Germany, England, and the United States, which customers did not engage the services of Mr. Buchi and therefore made no payments to my firm for his services; and I also know from information given to us by our customers and by Mr. Buchi, that Mr. Buchi has also made general arrangements with several of our customers directly for the payment of his services in respect to the application of our supercharging blowers to the Diesel engines made by the said customers and we have collected no fees for Mr. Buchi from such customers to whom we have shipped our supercharging blowers.

Counsel for the importer introduced also an affidavit of Dr. Alfred J. Buchi which was received in evidence and marked exhibit 2. After stating his qualifications and experience as an engineer, the affiant explains the character of the work he performs for his fee as follows:

* * *; since then I have practiced my profession of Consulting Mechanical Engineer in advising my clients in the United States of America and in other foreign countries of the application of the Buchi system of supercharging four-cycle Diesel engines as invented and developed by me and protected by patents in most civilized countries, which system seeks to further improve the results of supercharging by making certain changes and adjustments on the Diesel engine itself; after long years of testing and research with several types of supercharging devices, I recognized that exhaust turbine-driven blowers will give the best results if at the same time a number of changes are made to the Diesel engine which is to be supercharged. By so doing, the increase in output of the Diesel engine may reach 40 to 45% or even higher depending on the particular Diesel design.

This system of obtaining best results, as it is now developed, comprises definite changes to the cams of the Diesel engines, the dimensions and arrangement of the intake and exhaust piping, sometimes changes to the valves and always a rearrangement of the timing of the valves. These necessary modifications are determined after close study of the engine design. On the basis of this study, I write out the new operating data for supercharged condition, give guarantees for the expected improvement and furnish to the Diesel builder, who desires my services, general engineering advice for making such modifications to his Diesel engine, as I consider necessary for best results.

As compensation for these engineering services, I charge a fee, which varies with the increase in output guaranteed and obtained.

It will be evident from this description that it is not necessary to obtain my services for getting results with supercharging units. My system, however, enables the Diesel builder who wishes to apply it, to better the results obtained.

The affiant states that he has no connection with Brown, Boveri & Co., Ltd., except for the collection of his fee from the manufacturers of Diesel engines, using the following language:

When I am approached by, or make contacts with, builders of Diesel engines for the purpose of giving engineering advice on the possible improvements to their engines, I recommend that they obtain supercharging blowers from Brown, Boveri & Co., Ltd., of Baden, Switzerland, because I believe that their design of supercharging blowers obtains the best results, without any obligation however on the part of such Diesel engine builders to follow my advice. In the majority of cases such Diesel builders find it to their advantage to engage my services and to buy the supercharging units from Brown, Boveri & Co., Ltd., and as I maintain a consulting engineering office in Winterthur without any branch offices or agents in other countries, Brown, Boveri & Co., Ltd., through their branch offices or representatives in foreign countries, frequently make collections of my fees from such Diesel builders with whom I have made arrangements for my services, merely as an accommodation to me, and pay over to me the said fees as soon as they have collected them for my account. * * *.

I have had nothing to do with the designing or in the perfection of the design of the supercharging units manufactured by Brown, Boveri & Co., Ltd.

Counsel for the importer also introduced the testimony of Mr. Paul R. Sidler, an engineer employed by Brown, Boveri & Co., Ltd., as resident engineer in the United States. He testified that, since 1931, he has been trying to sell equipment, preparing offerings, conducting negotiations, and accepting orders for transmission to Brown, Boveri & Co., Ltd., and is the only individual in the United States selling their

products. His testimony on direct examination with respect to Dr. Buchi's system and the use and sale of superchargers is substantially the same as the statements relating thereto in exhibits 1 and 2.

On cross-examination, counsel for the Government endeavored to show a connection between the price of the supercharger and the fee for the Buchi system but the answer of the witness indicates that the price of the supercharger is not connected with the cost of the Buchi system. The testimony is as follows:

X Q. Mr. Sidler, is the price of the Buchi supercharger fixed according to the horsepower of the engine, is that what you testified?—A. There is not to my knowledge any Buchi supercharger. I am selling Brown, Boveri & Co., complete superchargers, and their price is fixed by the home office in Barden, Switzerland, for delivery at the factory.

The witness testified that the price of the fee to Dr. Buchi is fixed according to the horsepower of the engine but the price of the supercharger is fixed by the manufacturing company. The witness admitted that he quoted a price to the importer in this case for use of the Buchi system on the engine manufactured by the importing company when he quoted the price for the supercharger and that the acknowledgment of the order by Brown, Boveri & Co., Ltd., contained a reference to the fee. The witness was shown a photostatic copy of the acknowledgment which he admitted was a correct copy and it was admitted in evidence and marked exhibit A. It is a part of collective exhibit 5 which was subsequently admitted. The statement referred to on the acknowledgment reads as follows:

Fee for Dr. Buchi for engineering services and technical information in connection with the exhaust turbo-charger covered by your order No. F–1410 of 17th March, 1939:—U. S. A. Dollars 960.—[Italics quoted.]

Counsel for the Government offered also, as exhibit B, a photostatic copy of an acknowledgment of the order of the supercharging blower herein involved giving the details of construction of the blower VTx 350/77 and the price—$3,072—which included a charge for spare parts and delivery c. i. f. New York. This document is also a part of exhibit 5.

The witness testified that "Exhibit A refers to Buchi's fee and Exhibit B refers to the supercharger" and "this fee is payable when the supercharger arrives in New York, and the documents are turned over to this customer." The witness testified also that he had sold some superchargers in the United States in 1936 and 1937 where the Buchi system was not used on the engines but that in 1938 and 1939 all superchargers which he sold were used in connection with the Buchi system; that when he sold the instant supercharger the $960 fee was for the right to use the Buchi system and that such fee would

apply to each sale if sales were made of two superchargers for two identical engines, but if there were more than four identical applications of the Buchi system, Dr. Buchi grants certain reductions.

The witness testified further that the price of $3,072 for the supercharger involved in this case was exclusive of the $960 fee; that the supercharger is the same whether it is offered to the instant customer or to other customers, but, as Diesel engines built by various manufacturers differ and the output obtained with the superchargers differs, Buchi's fee also would differ because it is tied up with the Diesel engine; that the fee depends upon the construction of the engine; that he offers superchargers to anyone who is interested in having them but that does not include the Buchi system and it is immaterial to him whether or not the customer uses the Buchi system.

The witness testified further that there is an association in Switzerland known as Buchi Syndicate which includes Dr. Buchi as a person, Brown, Boveri & Co., Ltd., and Swiss Locomotive Co. and "in the territories which are under the control of the Buchi Syndicate, the superchargers are only furnished by Brown, Boveri & Co., or are under authorities or licensees"; that sales in the United States do not fall under the jurisdiction of the Buchi Syndicate.

Counsel for the Government produced a photostatic copy of a letter signed by the witness which was forwarded in connection with the offer of the supercharger in the instant shipment and it was admitted in evidence and marked exhibit C. It is a part of exhibit 5. It appears from this letter that, in order to use a supercharger which the shipper had in stock on the engine built by Worthington Pump and Machinery Corporation, it would be necessary to build a nozzle ring, turbine runner, and blower impeller, but the price would be the same, namely $3,072; that the advantage of using the blower which they had in stock would be that the construction could be completed in about 2½ or 3 months whereas it would take a longer time to construct an entirely new supercharger.

Counsel for the Government directed the attention of the witness to a photostatic copy of an order for a supercharging blower by the firm of McIntosh & Seymour Corporation, dated August 5, 1935, which was marked in evidence as exhibit D and which is a part of exhibit 5. The witness testified that the order covered a supercharging blower similar to that in the instant case but he did not take that order; that the president of McIntosh & Seymour Corporation made a trip to Switzerland and visited Brown, Boveri & Co., Ltd., and also visited Dr. Buchi, and, as a result of talks, placed the order. An inspection of that exhibit shows that the order contains a statement reading as follows:

(D) Royalty for applying the patented Buchi turbo-charging system. Calcu-

lations, supervision and control of all deciding items including turbine and blower, Swiss Frs. 2800.

\* \* \* \* \* \* \*

*Note:* It is further agreed between our Mr. R. B. McColl and Dr. Alfred Buchi, that at no charge to us, he will make a visit to our plant when this equipment is in operation.

The witness was shown a photostatic copy of an order for 10 supercharging blowers given by the American Locomotive Co., dated September 16, 1936, which was admitted in evidence and marked exhibit E. It is a part of exhibit 5. The witness testified that he placed that order and that all of the superchargers covered by that order were the same dimension and were to be used on 10 different engines of the same kind and the cost for Mr. Buchi's fee was $828 for each engine and that the order included the right to use the Buchi system. We note that the document contains the statement "8,280.00—royalty for Mr. Buchi."

The witness testified further that in the fall of 1938 Dr. Buchi was in the United States and made a separate contract with the American Locomotive Co. to cover his services on a permanent basis, and, from that time on, Dr. Buchi did not ask his company to collect the fee from the American Locomotive Co.

The witness was then asked if he sold superchargers with the right to use Dr. Buchi's system to General Motors and he testified that he sold 4 superchargers to that firm in the summer of 1939 and the right to use Dr. Buchi's system; that there were 2 engines each having 16 cylinders and 2 superchargers were used with each engine. When asked how he determined the amount of the fee, he said:

A. I knew the output for using the Buchi system, and after attaching the superchargers, and then I also could determine the so-called mean effective pressure, a characteristic of the Diesel engines in general, and by having these two figures and a third factor, I multiply them and obtain a certain amount of Swiss francs.

X Q. Well now is that for each one you obtained the amount of Swiss francs for each one?—A. For each engine, yes.

X Q. And then you multiplied that by the number which he purchased, is that right?—A. Yes.

X Q. The number of units which he purchased?—A. Yes, in this particular case there are 2 engines and 4 superchargers; 2 superchargers on one engine.

Upon redirect examination the witness was asked if Dr. Buchi fixes the amount of his fee or whether Brown, Boveri & Co., Ltd., fixes the amount and he replied that Dr. Buchi fixes the amount of his fee and has changed it from time to time; that Dr. Buchi writes his formula and Brown, Boveri & Co., Ltd., instructed him to take such information from Dr. Buchi and do the necessary things in determining the amount of the fee.

The attention of the witness was directed to the statement in exhibit C relating to the necessity of building a new nozzle ring,

turbine runner, and blower impeller if a stock supercharger was purchased and he stated that such changes were not made in the instant supercharger. On recross-examination he testified that the stock unit was not the one that was ordered but they built a new unit.

Counsel for the Government introduced six reports of Government agents and they were admitted in evidence and marked exhibits 3 to 8.

Exhibit 3 is a photostatic copy of a report (703/218) of Treasury representative Karl M. Richards, dated February 9, 1940. It relates to an investigation made with respect to shipments of supercharging blowers by Brown, Boveri & Co., Ltd., on January 30, February 14, March 25, and April 3, 1939, to the American Locomotive Co. of Auburn, N. Y. The Treasury representative states that he visited the office of Brown, Boveri & Co., Ltd., at Baden, Switzerland, and interviewed Mr. Zaugg, commercial director, Mr. E. Klingelfuss, chief engineer, and Mr. W. Muller, chief accountant, who gave information which he verified from the records of the concern. He reports that Brown, Boveri & Co., Ltd., is the owner of the patents on the blowers they manufacture and that he examined a contract between Brown, Boveri & Co., Ltd., and the Buchi Syndicate. The portion of the report relating to the provisions of that contract regarding sales in the United States reads as follows:

Under the provisions of this contract, all fees for the right to use the Buchi system of installation in the United States are specifically reserved for Dr. Buchi. At Dr. Buchi's request, the manufacturer makes and sells supercharging blowers to United States customers on the same basis as for customers in countries other than the United States and has also acted as a collector for the fees from United States customers who have not purchased general rights. The fee for United States customers has been slightly higher than for customers of countries other than the United States. The American Locomotive Company, on September 28, 1938, purchased general rights to use the Buchi system of installation and the fees collected for such rights are paid direct to Dr. Buchi. These fees include consulting engineers' services and blue prints.

There is nothing in the contract between the manufacturer and the Buchi Syndicate or in the agreement between the manufacturer and Dr. Buchi, to prohibit the manufacturer from selling superchargers to purchasers in the United States or elsewhere, without regard to the use of the Buchi system of installation. The United States purchaser may or may not use the Buchi system of installation. If he uses the system, he pays the fees for the right to use it, direct to Dr. Buchi, or to Dr. Buchi, through Brown, Boveri & Co.

All collections for patent and engineering fees from United States customers are transmitted to Dr. Buchi.

As the other statements in the report, relating to the sale of supercharging blowers to the United States, are in substantial accord with the evidence introduced by the importer in this case, we deem it unnecessary to discuss them.

Exhibit 4, which is a report (703/24) by Treasury representative Karl M. Richards, dated February 9, 1940, relates to an investigation

at the office of Dr. A. Buchi in Winterthur, Switzerland. The Treasury representative reports that Dr. Buchi gave him the following information which was verified from the regular books of account and other records:

*Patents.*

Consideration must be given to the two following groups of patents:

1. Patents relative to the installation of "Exhaust gas turbine driven superchargers". Publications in English relative to this system are attached as Exhibits A. to F. The first patents on this system were taken out in 1905.

2. Patents relative to a Supercharging blower to be used in conjunction with the above system.

The blowers exported to the United States are manufactured under patents held by Brown-Boveri Co. Ltd., Baden, Switzerland.

Dr. Buchi also holds patents for a slightly different blower to be used with his system.

*Sales of License and engineering services for the United States.*

Dr. Buchi holds all patent rights for his system in the United States. He sells rights and engineering service to two general classes.

I. *General license.*—In such cases Dr. Buchi makes a contract whereby he receives a certain percentage of the selling price of all machines equipped with his system in exchange for the right to use the patented system and the engineering plans and supervision for its installation.

There are today two customers in the United States holders of a general license:

  A. Cooper Bessemer Corp., Mt. Vernon, Ohio (old contract).
  B. American Locomotive Co., Auburn, New York.

  *  *  *  *  *  *  *

B. *Buchi Patented Supercharging blowers.*

1. American Locomotive Co. can manufacture Buchi patented blowers and pay Buchi 5% of net value. * * *

II. *Individual licenses.*

Manufacturers wishing to test the Buchi system may purchase the patent rights and the engineering plans and supervision for one or more machines at a charge based on the following formula:

0.7 x mean effective pressure of motor x brake horsepower.

The result in Swiss francs is converted into dollars at the current rate of exchange. The charge is the same for all buyers.

In order to avoid the danger of using a supercharging blower not adapted to the system, Dr. Buchi insists that all individual licensees agree to buy their blowers from Brown-Boveri Co., Baden, Switzerland or one of its licensed manufacturers.

  *  *  *  *  *  *  *

Dr. Buchi keeps an engineering assistant in the United States permanently and makes frequent trips himself to study results and supervise changes.

Exhibit 5 is a report of Treasury representative Horace A. Browne, dated at Buffalo, N. Y., January 16, 1941. It appears that the Treasury representative, accompanied by customs agent Sigmund Neustadt, visited the office of Worthington Pump and Machinery

Corp. in Buffalo, N. Y., and consulted with Mr. C. R. Collins, local purchasing agent, and Mr. James C. Barnaby, engineer, who furnished books and records of the firm. Photostatic copies of the records in the office are attached to the report. The report states:

It appears that the superchargers manufactured and sold by Brown, Boveri & Co. Ltd., Baden, Switzerland are divided into two classes: 1) superchargers equipped with a gas-turbine blower for charging according to the Buchi system and 2) those without such equipment.

*Sole Importation.*

The supercharger under investigation represents the first supercharging unit equipped with the Buchi system purchased by Worthington Pump and Machinery Corp. from Brown, Boveri & Co. Ltd., and is in fact the only supercharger of any kind ever bought by the importer from the manufacturer in Baden, Switzerland.

\* \* \* \* \* \* \*

The supercharger under consideration was attached to an engine which is now operating at the main factory of the Worthington Pump and Machinery Corp., Harrison, N. J., so that it was not possible to view the identifying plate that is usually affixed to a Buchi supercharger in accordance with the United States Patent Laws.

Mr. Barnaby admitted that the use of the Buchi system without the consent of Dr. Buchi or the Buchi Syndicate in Winterthur, Switzerland would be an infringement of patent rights and would result in a suit for damages and an injunction from the court.

The Treasury representative states further that he called at the office of the American Locomotive Corporation in Auburn, N. Y., and made copies of documents in that office relating to importations of superchargers by that firm. These copies are also attached to the report. Some of the copies of the records of the Worthington Pump and Machinery Corporation in this exhibit were specially introduced in evidence during the cross-examination of witness Sidler and were marked exhibits A, B, C, D, and E, heretofore described.

Exhibit 6 is a letter signed by customs agent Sigmund Neustadt. This letter, which is addressed to the Assistant Attorney General contains no additional information but appears to be in the nature of a brief. It has no value as evidence in the case.

Exhibit 7 is a letter from the appraiser at San Francisco, addressed to the Assistant Attorney General, enclosing a copy of a report by Customs Agent J. P. Sheehan, dated at San Francisco on January 24, 1941, relating to imports and use of supercharging blowers by Enterprise Engine Co. of San Francisco and Union Diesel Engine Co. of Oakland, Calif. The customs agent attached to his report photostatic copies of correspondence from February 14, 1938, to September 13, 1940, between the Enterprise Engine Co. of San Francisco and Alfred J. Buchi of Winterthur, Switzerland; Brown, Boveri & Co., Ltd., of Baden, Switzerland; Paul R. Sidler of New York and Sommers & Young of Washington, D. C., who represent Dr. Buchi in the United

States. These letters contain negotiations relating to the purchase of supercharging blowers manufactured by Brown, Boveri & Co., Ltd., and also to a license to manufacture Diesel engines and superchargers covered by United States patents issued to Dr. Alfred J. Buchi. The letters written by Paul R. Sidler and by Alfred J. Buchi contain references to a fee to be paid for Dr. Buchi's services. Some of the documents refer to such fee when the Brown, Boveri & Co. blower is delivered while others refer to a charge when a supercharger patented by Dr. Buchi is used. One letter refers to the same license fee when a blower manufactured by a United States firm is used in the construction of an engine using the Buchi system.

The exhibit contains also a copy of a contract entered into between the Enterprise Engine Co. and Mr. Walter H. Young of Sommers & Young, representing Dr. Alfred Buchi, licensing and empowering the Enterprise Engine Co. to make, use, and sell an engine embodying the inventions covered by United States patents 1,895,538 and 2,159,422 issued to Dr. Buchi, covering internal-combustion engines and a gas turbine driven blower at a specified fee.

The report of the customs agent contains a brief resumé of the different documents attached to his report and also of similar documents in the files of the Union Diesel Engine Co. He reached the following conclusion with respect to the application of Dr. Buchi's fee:

While it appears that payment of the Buchi fee by a purchaser such as Enterprise Engine Company is an inseparable accompaniment of the acquisition by purchase of the Brown, Boveri & Company supercharger blower, when the Buchi system is to be used; and while it appears because of the fact that the fee is based on output of the (Enterprise) engine, that the fee is a license or royalty fee rather than compensation for engineering services, it is not at all certain, from subsequent developments, as given hereinafter, that the fee is a license or royalty fee on the *blower*. It seems to be rather, a license or royalty fee on the *engine*, which is manufactured in this case by Enterprise Engine Company in the United States. [Italics quoted.]

Exhibit 8 is a letter addressed to the Assistant Attorney General by customs agent Malcolm Gerry. The customs agent states that he and Treasury representative Paul Hermes visited the plant of the Worthington Pump & Machinery Corp. of Harrison, N. J., and interviewed Mr. Paul Diserens, chief consulting engineer. The customs agent reports as follows:

* * *. Mr. Diserens was asked to explain what the Buchi system consisted of, in answer to which he stated that it was a system of supercharging an engine by means of an exhaust driven blower and involved certain modifications to the engine itself. Mr. Diserens was then asked whether his company, in purchasing the supercharger, was primarily concerned with acquiring the rights to use the system or whether he was primarily concerned with obtaining the supercharger. To this he answered that his company had purchased the blower from Brown, Boveri & Company, Ltd. of Switzerland, but that under the terms of the Buchi Syndicate, Brown, Boveri & Company could not sell the blower to his company without the permission of Dr. Buchi.

He was then asked if Dr. Buchi was able to exercise this control through the ownership of patent rights, to which he answered in the affirmative. In this connection, he confirmed the statement of James C. Barnaby, engineer of the Worthington Pump & Machinery Corporation, Buffalo plant, to the effect that the purchase of the supercharger did not carry with it the rights of use and that to use it without the permission of Dr. Buchi would be a violation of his patent rights in the United States as well as in other countries.

Diserens was then asked whether these patent rights were inherent in the supercharger itself, in answer to which he stated that some of them were and that some of them involved the system as a whole, taking into consideration the engine as well.

Mr. Diserens was also asked whether or not, in the application of this supercharger to this engine, any modification or changes were made in the valves, valve timing, combustion chamber contour, cam contour, or exhaust manifold. In answer, Mr. Diserens stated that the only changes which had been made to this (a standard Worthington Diesel engine) were in respect to the exhaust manifold. (The exhaust manifold is the pipe or pipes through which the exhaust gasses are taken away from the engine.) In this case the standard manifold which terminates in a single pipe was removed and two manifolds, each taking gasses away from three of the six cylinders, were made. These manifolds were made by the Worthington Corporation so as to be attached to the two inlet ports of the imported supercharger. As an afterthought, Mr. Diserens also explained that a bracket had been provided for carrying the supercharger but admitted that this change was not functional.

The plaintiff called Mr. Paul Diserens in rebuttal. He testified that he is an engineer holding the degrees of bachelor of science and also mechanical engineer and that he is connected with the Worthington Pump and Machinery Corporation located at Harrison, N. J. The witness recalled the visit of Mr. Malcolm Gerry and Mr. Paul Hermes and testified as follows with respect to some of the statements in exhibit 8:

Q. On page 1 of the letter dated January 27, 1941, signed by Malcolm Gerry, which is now marked Exhibit 8, it is stated: "Mr. Diserens was then asked whether his company, in purchasing the supercharger, was primarily concerned with acquiring the rights to use the system or whether he was primarily concerned with obtaining the supercharger. To this he answered that his company had purchased the blower from Brown, Boveri & Company, Ltd. of Switzerland, but that under the terms of the Buchi Syndicate, Brown, Boveri & Company could not sell the blower to his company without the permission of Dr. Buchi." Did you make that statement?—A. I don't recall such a statement.

Q. Did you intend to say that?—A. I recall a conversation on the subject, and I would say I told him, my statement was something like this: we purchased a blower from Brown, Boveri, & Company and we had a license from Doctor Buchi to apply his system for which we got the blower. We purchased the blower from Brown, Boveri, & Company to use it on our engine.

Q. That is on a Diesel engine?—A. On a Diesel engine, yes.

Q. Did you ever make the statement that under the terms of the Buchi Syndicate, Brown, Boveri & Company could not sell the supercharger to your company without the permission of Doctor Buchi?—A. No. I made no such statement. If I made a statement on that subject, that is a garbled report of my statement.

Q. It is not correct as it is written in this report?—A. That is an untrue statement.

Q. The following paragraph says: "He [referring to you] was then asked if Dr. Buchi was able to exercise this control through the ownership of patent rights, to which he answered in the affirmative."—A. I would like to read that because I don't know what this refers to.

\* \* \* \* \* \* \*

Q. Did you make such a statement?—A. I made a statement on the subject, but as I remember it that is a very incomplete and inaccurate report of what I did say.

Q. In what respect is it incomplete?—A. It seems to indicate there ——. Let me see that last paragraph. It seems to indicate here that I led him to believe we could not use the Brown-Boveri blower without Doctor Buchi's permission, but what we really could not use without Doctor Buchi's permission is his system of supercharging. If I made any statement, it must have been because that is a fact.

Q. In other words, you are or were free to buy and to use the blower of Brown, Boveri & Company and to use it on your Diesel engine without Doctor Buchi's permission?—A. Yes, provided we did not use the Buchi system.

Q. And what is that system; what does that consists of?—A. That is a system of engineering which supplies air to a Diesel engine increasing the horsepower output of the Diesel engine, and it involves a number of particular elements. It involves a particular kind of valve timing.

Q. In what?—A. In the engine valves. It involves in combination with that a particular system of intake and exhaust piping.

Q. In what?—A. In the engine.

Q. In the Diesel engine?—A. In the Diesel engine. So as to bring about the proper pressure waves that occur in such piping. It involves a blower driven to supply air to the engine. That system involves all of those things and unless it has those things it is not the Buchi system.

\* \* \* \* \* \* \*

Q. Did you ever make the statement that Doctor Buchi exercises control through the ownership of patent rights in respect to the sale of a supercharger that is used in connection with a Diesel engine?—A. I have no information on that subject so I hardly could have said it because I don't know.

Q. In the second paragraph, it is stated, "In this connection he [meaning you] confirmed the statement [of another party] to the effect that the purchase of the supercharger did not carry with it the rights of use and that to use it without the permission of Dr. Buchi would be a violation of his patent rights in the United States as well as in other countries."—A. That seems to be a garbled version of some such statement that I did make. In other words, we cannot use the Brown-Boveri blower or any other blower in the Buchi system without Doctor Buchi's permission.

\* \* \* \* \* \* \*

Q. At the bottom of page 2 and at the top of page 3, it is stated: "In general, Mr. Diserens stated that he had seen the patents covering the supercharger, which he admitted was the essential element of the Buchi system as well as the patents covering the system itself in its entirety," etc. Did you admit or did you say that the supercharger was the essential element of the Buchi system?—A. No. I doubt whether I said that. It is not so if I did say it. I am sure I didn't say it.

Q. Do you know of the patent which Doctor Buchi has for a supercharger?—A. I have seen such a patent.

Q. Have you read or did you read that patent to determine the features of the supercharger that was patented by Doctor Buchi?—A. I would say I have reviewed all those patents and read rather hurriedly the claims made in them.

Q. Is there a difference between the supercharger patented by Doctor Buchi and the supercharger you purchased from Brown-Boveri & Company?—A. The patent which I have seen covering the supercharger patented by Doctor Buchi differs from the supercharger, or the blower which I prefer to call it, which we purchased from Brown, Boveri & Company.

The testimony of the witness was not weakened on cross-examination. A photograph of the engine built by the Worthington Pump & Machinery Corporation, incorporating the Buchi system and using the supercharging blower imported in the instant case, was admitted in evidence and marked exhibit 10, and the witness drew a circle around the supercharging blower and marked with an X the exhaust pipes installed on the engine by the manufacturing company and an X in a circle on the intake pipes to the engine cylinders. The witness testified that he did not know whether the engine was newly built or whether one of their stock engines was used as a base and the changes proposed by Dr. Buchi installed thereon but "it doesn't mean a thing, whether we built an engine for this particular job or whether we took one out of stock and modified it. It is of no consequence."

Mr. Paul R. Sidler was recalled in rebuttal and was asked the following questions concerning statements made by the customs agent in exhibit 6:

Q. In the report which is marked Collective Exhibit 6, in a letter signed by Customs Agent Neustadt of New York there is a statement to the effect that "the operation of the supercharger embodying the Buchi system automatically and inevitably utilizes the Buchi process without any outside aid or contribution whatsoever". Is that true in connection with the Brown-Boveri supercharger you sold to the Worthington Pump and Machinery Corporation in this case?— A. I think that is mixed up. There is no supercharger that embodies the Buchi system. It is the other way around. The Buchi System embodies the use of a supercharger.

Q. Whether it is the Brown-Boveri supercharger or any other supercharger?— A. Whether it is the Brown-Boveri supercharger or any other supercharger, provided it is driven by exhaust gas.

Q. Are there other superchargers that are driven by exhaust gas besides the Brown-Boveri supercharger?—A. Yes. The General Electric Company builds a supercharger that does; the American Locomotive Company builds such a supercharger, and now, very recently, the Elliott Company in this country builds also such a supercharger.

  *   *   *   *   *   *   *

Q. Do you know of your own knowledge whether Doctor Buchi prepares drawings and specifications, or did prepare any drawings or specifications for the supercharger blower you sold to the Worthington Pump and Machinery Corporation?—A. I know that he did not.

Q. How do you know?—A. Because I know that the drawings and specifications for this supercharger or any other supercharger are prepared by our company.

Q. Did you submit those drawings yourself?—A. Yes. They were Brown-Boveri drawings. The drawings that Doctor Buchi has to do are the design features on the Diesel engine, and those in many cases I see, and in others I do not, because he mails them directly to the Diesel engine manufacturer.

The witness was also interrogated concerning a statement of the customs agent in exhibit 7. That testimony reads as follows:

Q. In the report of the Treasury Agent dated March 14, 1941, which is Collective Exhibit 7, on the last page, page 19, of a letter signed by J. P. Sheehan, Customs Agent, dated January 24, 1941 and directed to the Appraiser of Merchandise at San Francisco, it is stated: "It would seem a plausible inference from the last sentence quoted and a natural inference from the correspondence, that Brown, Boveri & Company do not carry completed or nearly completed supercharging blowers, ready or nearly ready for shipment, unless the engine manufacturer has already ordered them or guaranteed to order them within a specified time. The contention in the three affidavits quoted, that Dr. Buchi has nothing to do with designing of the supercharging blower or changes therein, does not seem to be consistent with the fact that the blower for any individual engine cannot be completely manufactured without the incorporation of important features, which in turn cannot be incorporated until after receipt by Brown, Boveri & Company of specific technical data from Dr. Buchi." Will you please state whether that is true? A. The important features which are not in the superchargers are not determined by any data that Doctor Buchi furnishes. The important features given evidently refer to those parts that I have repeatedly mentioned: the nozzle ring, the turbine runner, and the blower wheel. In all of those we have a number of sizes which we have in stock and when Doctor Buchi gives us a specific case where there is to be so many cubic feet of air then we take out of our groups of wheels that we have already finished the one wheel that gives that volume of air, at that speed, and put it in, and then the supercharger is finished. * * *.

Counsel for the importer introduced in evidence, as collective exhibit 9, some correspondence relating to the offer of the supercharging blower in the instant case. There is one carbon copy of a letter evidently sent by the importer to Dr. Buchi concerning the specifications of this engine to be built under the Buchi system.

The testimony of the witness on cross-examination is similar to that given when he was first called in the case and will not be reviewed in detail in this decision.

We find that the following facts are supported by the weight of evidence:

1. The supercharging blower under consideration was manufactured by Brown, Boveri & Co., Ltd., of Baden, Switzerland, under patents issued to that firm and that it was sold to the Worthington Pump & Machinery Corporation at the price at which such blowers were freely offered for sale to all purchasers for exportation to the United States at the time of exportation, in the usual wholesale quantity in the ordinary course of trade, which price did not include the license fee of Dr. Buchi, and that the foreign value was no higher.

2. Dr. Alfred J. Buchi of Winterthur, Switzerland, also holds a patent for supercharging blowers different from those manufactured

by Brown, Boveri & Co., Ltd. The American Locomotive Co. of Auburn, N. Y., and the Enterprise Engine Co. of San Francisco have licenses to manufacture supercharging blowers under the Buchi patent and also supercharging blowers are manufactured by other firms in the United States and in Europe.

3. Dr. Alfred J. Buchi also holds a patent, issued in 1905, for supercharging Diesel engines. His patent is also registered in the United States Patent Office. This patent covers a method of supercharging Diesel engines by air pressure which enables the engine to produce greater power and involves (1) certain timing of the valves, which is accomplished by cams on the engine, and (2) arrangements and dimensions of the intake and exhaust piping on the engine. A supercharging blower is also used on the engine under his system but the type of blower is not included within the patent relating to the method for increasing the power in the engine. All that is required of the blower is that it give a certain volume and pressure of air to conform with his requirements.

4. There are two kinds of licenses issued by Dr. Buchi for the use of his system, one called a "General License," under which Dr. Buchi receives a percentage of the sales price of the engine produced in addition to a stated fee, and the other, called an "Individual License," under which an engine manufacturer pays a fee for the use of the patented system on each engine manufactured, together with engineering plans for one or more engines at a price based on the following formula: "0.7 x mean effective pressure of motor x brake horse-power" which gives the amount of the fee in Swiss francs. When an engine manufacturing company engages Dr. Buchi's services, Dr. Buchi writes out the new operating data for the supercharged condition of the engine, gives a guarantee for the expected improvement, and furnishes general engineering advice for making the modifications to the engine, in addition to giving the manufacturing company the right to use the system.

5. Brown, Boveri & Co., Ltd., entered into a contract with the Buchi Syndicate to compute and collect Dr. Buchi's fee when a supercharging blower is sold in the United States to a firm having an "Individual License" with Dr. Buchi, and transmit the fee to him, and Dr. Buchi agreed to recommend to the customer that a Brown-Boveri blower be ordered to use with the engine as modified by his system. When the purchaser has a "General License," however, Brown, Boveri & Co., Ltd., do not quote or collect the fee or consider it in the negotiations with the customer, but the amount charged by Dr. Buchi is forwarded by the manufacturer directly to Dr. Buchi. There is nothing in any of the contracts or agreements which prohibits Brown, Boveri & Co., Ltd., from selling their supercharging blowers to firms in the United States not using the Buchi system, and, in fact, there

were some sales in 1936 and 1937 to firms not using the system, but in 1939 all of their sales of supercharging blowers made to firms in the United States were to firms using the Buchi system for supercharging Diesel engines.

The appellant sets forth the contention of the Government in its brief as follows:

> The Government contends that the dutiable export value is the manufacturer's invoice price plus $960.00 paid to the patentee of the aforesaid system for the *right to use* the blower, or a total of $3,152.00. [Italics quoted.]

We are of opinion that this contention is based on a false premise. The fee collected by the seller for Dr. Buchi was for the right to use Dr. Buchi's system for the production of a Diesel engine in the United States and not for the right to use the blower manufactured by Brown, Boveri & Co., Ltd. The importation did not consist of a Diesel engine manufactured under the patent issued to Dr. Buchi. It consisted of only a blower which was purchased for use in the manufacture of the engine. It is merely a material or a part to be used in the construction of the engine. It is obvious that the Buchi system is not a part of the supercharging blower sold by Brown, Boveri & Co., Ltd. While the Buchi system requires a supercharging blower to be operative, the Brown-Boveri blower is not necessary to the system. Any supercharging blower would do if it produced the proper volume of air pressure.

The appellant contends also that the fee for Dr. Buchi is a part of the value of the blower because it was included in the offers of the exporting company to all purchasers of the blower during the year 1939, which is within the period of exportation of the blower herein involved. The evidence shows, however, that the same kind of supercharging blowers were offered and sold by the exporter to the American Locomotive Corporation during that period with no reference to Dr. Buchi's fee because that company had a special contract with Dr. Buchi with respect to his fee and paid the amount directly to Dr. Buchi. It happened that during that year all sales of supercharging blowers made by Brown, Boveri & Co., Ltd., were made to customers who manufactured engines under Dr. Buchi's patented system, but in former years supercharging blowers had been sold to firms who did not use Dr. Buchi's system. Dr. Buchi authorized Brown, Boveri & Co., Ltd., to collect his fee from the importer and to notify the importer of the size of the fee. That authorization is separate and distinct from the exporter's transaction involved in selling the blower. The exporter acted in a dual capacity. It acted for itself in selling the blower and it acted for Dr. Buchi in computing and collecting his fee.

The appellant claims also that the fee for Dr. Buchi is a royalty and therefore should be added to the value of the blower, citing

*General Dyestuff Corporation* v. *United States*, 19 C. C. P. A. (Customs) 309, T. D. 45480, and *International Forwarding Co.* v. *United States*, 17 C. C. P. A. (Customs) 86, T. D. 43377.

*General Dyestuff Corporation* v. *United States, supra,* was distinguished by this court in *United States* v. *Rohner Gehrig & Co., Inc.*, 4 Cust. Ct. 864, Reap. Dec. 4923, which is a case covering the same kind of merchandise and is the test case on this subject cited by the importer in this case when an advance in value was made on entry to meet the advance of the appraiser in the test case. The court held in the test case that the fee paid to Dr. Buchi was in some respects similar to the royalty considered in *United States* v. *Tide Water Oil Co.*, 19 C. C. P. A. (Customs) 392, T. D. 45554, and therein held not to be a part of the dutiable value of the importation.

The case of *International Forwarding Co.* v. *United States, supra,* was inaugurated by a petition for remission of additional duties and the question concerning the dutiable character of a royalty was brought out as an incident of the case. It appears that the importation consisted of an oxygen-rectification column for which the importer paid a lump sum installed. This sum included a charge for a royalty paid by the foreign manufacturer for the right to manufacture the merchandise, and the foreign manufacturer included the amount of the royalty in the sales price of the oxygen-rectification column. The court stated that the charge for the royalty was properly held to be a part of the dutiable value because it was included in the price at which the plant was freely offered for sale.

The appellant attempts to distinguish *United States* v. *Vandegrift & Co. et al, Kimble Glass Co.*, 26 C. C. P. A. (Customs) 360, C. A. D. 42, by stating that the additional charge for the fee for Dr. Buchi is for the right to use the supercharging blower, which is not a fact in this case.

The facts in the cases cited by the appellant are quite different from those in this case. Those cases involved a royalty on machines or plants of machinery which were imported, while here the fee for Dr. Buchi is for the right to build Diesel engines in the United States, using Dr. Buchi's patented specifications. There was no royalty involved in the production or sale of the supercharging blower which constituted the importation.

We hold that export value is the proper basis for appraisement in this case and that such value is the entered value, less the amount added by the importer on entry to meet the advance made by the appraiser in a test case pending reappraisement. As the trial court reached a similar conclusion, the judgment below is affirmed.